843 F.Supp. 1556 (1994)
OXFORD HOUSE-C, et al., Plaintiffs,
v.
CITY OF ST. LOUIS, Defendant.
No. 91-2402-C(7) (CDP).
United States District Court, E.D. Missouri, E.D.
January 28, 1994.
*1557 *1558 *1559 *1560 *1561 Susan M. Alverson, Dennis J. Capriglione, Ann B. Lever, Legal Services of Eastern Missouri, Herbert A. Eastman, St. Louis University Law School, Mary Stewart Tansey, Asst. Atty. Gen., St. Louis, MO, Joseph D. Rich, Kenneth H. Zimmerman, U.S. Dept. of Justice, Housing & Civ. Enforcement Section, Washington, DC, for plaintiffs.
Julian L. Bush, Assoc. City Counsel, City of St. Louis, Law Dept., Michael A. Garvin, James L. Matchefts, Patrick J. Connaghan, Office of City Counselor, St. Louis, MO, for defendant.

MEMORANDUM OPINION
PERRY, United States Magistrate Judge.
Plaintiffs in this case seek an injunction and declaratory judgment prohibiting the City of St. Louis from enforcing its zoning and building ordinances in a manner that would prohibit two Oxford Houses, which have ten and twelve residents, from operating within the City's single-family residence zoning districts. Plaintiffs, who represent recovering alcoholics and drug addicts, allege that the City's enforcement of its ordinances discriminates against them on the basis of their handicap in violation of the Fair Housing Act, 42 U.S.C. ง 3601 et seq., as amended by the Fair Housing Amendments Act of 1988, and other federal laws. The matter is before the Court following a non-jury trial. Based upon the testimony, exhibits, stipulations presented at trial, and pre- and post-trial briefs, the Court makes the following findings of fact and conclusions of law.

Findings of Fact

I. The Parties

1. Plaintiffs Oxford House-C ("OH-C") and Oxford House-W ("OH-W") are unincorporated associations consisting of each house's current residents, located in the City of St. Louis, Missouri. Their purpose is to provide a home for recovering (sober) alcoholics and drug addicts.
2. Plaintiff Oxford House, Inc., is a Delaware corporation with its principal place of business in Silver Springs, Maryland. Oxford House, Inc. advocates for and assists in providing housing for recovering alcoholics and addicts, and is a membership organization whose members are the residents of individual Oxford Houses across the country, including OH-C and OH-W. Oxford House, Inc., has granted charters to plaintiffs OH-C and OH-W and has expended substantial effort seeking to protect their right to supportive housing in the community. Oxford House, Inc., also has a contract with the State of Missouri for the collection of loan repayments from and provision of other assistance to individual Oxford Houses in Missouri.
3. Plaintiff-Intervenor the Missouri Department of Mental Health, Division of Alcohol and Drug Abuse is a state agency created under the Missouri Constitution, Article IV, Section 37(a) and Chapters 630 and 631, R.S.Mo.1986, as amended. The Department of Mental Health, Division of Alcohol and *1562 Drug Abuse (hereinafter, "the Missouri Department") receives $18-22 million per year in federal alcohol and drug abuse and mental health services block grant funds under 42 U.S.C. ง 300x.
4. Defendant the City of St. Louis is a municipal corporation existing and operating under a Charter recognized by Article VI, ง 31 of the Constitution of Missouri. The City of St. Louis receives federal funds, including approximately $22.6 million for fiscal year 1991, $23.3 million for 1992, and $26 million for 1993, under the Community Development Block Grant (CDBG) program. The City's Department of Public Safety, which includes the Zoning Administration and the Division of Building and Inspection, receives funding from the CDBG grant.

II. The Oxford House History

5. In 1975, Paul Molloy and several other recovering alcoholics and drug addicts formed the first Oxford House. Molloy testified that he and the others had been residing in a halfway house which faced closure by the county because of a lack of funding. The residents decided, through the encouragement and assistance of some of their compatriots and sponsors at Alcoholics Anonymous, to rent and operate the house themselves, for themselves, as none of them yet felt ready to live independently, despite the fact that they were all well into their periods of sobriety, and despite the fact that they had already lived for some time in a supervised halfway house and had received treatment for their addictions. From its inception, this first Oxford House was run differently from a typical halfway house. No staff was present at the house, and a resident could stay as long as he wished, provided he remained drug- and alcohol-free and paid his share of expenses. This model proved to be successful and Molloy expanded the concept and assisted other groups in starting other Oxford Houses around the country.
6. In 1988, Congress enacted and President Reagan signed legislation to encourage expansion of the Oxford House model for drug treatment on a nationwide scale. Pub.L. No. 100-690, 102 Stat. 4181 (November 18, 1988). As it was re-enacted in the ADAMHA Reorganization Act of 1992, the program requires all states receiving federal block grant funds for alcohol and drug abuse and mental health services to establish a revolving fund of at least $100,000.00 to make loans available to help establish group homes for recovering alcoholics and addicts. Groups of at least six recovering alcoholics or addicts who wish to live in a group home based on the Oxford House model can apply for a loan of up to $4,000.00 to cover the start-up costs of renting and equipping the home. The loans are interest-free and must be repaid by the residents of the home within two years. 42 U.S.C. ง 300x-25. The statute specifically requires the homes to follow the three basic rules of absolute sobriety and automatic expulsion, self-governance, and financial self-sufficiency.
7. The Missouri Department, through a contract with the Missouri Housing Development Commission, has established a revolving fund of $100,000.00 pursuant to 42 U.S.C. ง 300x-25 to provide start-up loans not to exceed $4,000.00 to Oxford House-type residences. The Missouri Department provides staff to locate suitable housing, arrange for the initial lease, screen and accept the first residents, offer technical assistance to establish the Oxford House, and give on-going assistance to residents of the Oxford House as needed to enable the home to operate under Oxford House principles. The Missouri Department also has a contractual relationship with Oxford House, Inc., for the collection, quality control, reporting, and other technical assistance associated with the loan funds awarded to Oxford House-type recovery homes under the contract with the Missouri Housing Development Commission.
8. All Oxford Houses share the same three basic rules: (1) each house must be democratically self-governing; (2) each house must be financially self-sufficient; and (3) any person using drugs or alcohol must be immediately expelled from the House.
Oxford Houses are not traditional half-way houses, because they do not have any on-site staff or supervision. Oxford House, Inc. and the Missouri Department provide assistance in setting up individual houses and provide *1563 initial technical support. Once established, however, individual Oxford Houses are no longer subject to direct, ongoing control by either Oxford House, Inc., or the Missouri Department, but instead become self governed. Residents make all decisions regarding management of the house, including decisions regarding admitting and expelling members.
Members of each house share expenses equally, elect their officers, and pay dues to Oxford House, Inc. Individual Oxford Houses must support themselves, including repaying the start-up loans. In general the houses have from 8 to 15 residents; they are segregated as to sex but are intentionally integrated by race, age and economic background. There are over 450 Oxford Houses in the United States. There is no limit on the length of time a resident may remain in the house, so long as the members remain drug and alcohol free, pay their share of the expenses, and are not expelled for disruptive behavior. The average length of stay is 13 to 15 months.
9. The three basic rules of self-governance, financial self-sufficiency, and automatic expulsion upon one use of drugs or alcohol are all therapeutically based. Substantial evidence presented at trial showed that these rules foster important and valid recovery aims. The rule of absolute sobriety is based on the prevailing and well-established medical opinion that total abstinence is required for effective treatment of alcoholism or drug addiction. The requirement that the members of a home automatically expel any member found to have used alcohol or drugs reinforces the recovery of the other members as it shows them, consistent with this basic tenet of substance abuse treatment, that there are no second chances and that one mistake will result in the loss of the Oxford House resource in a person's recovery. The evidence showed that alcoholics and drug abusers frequently have lost contact with their families or mainstream society prior to their recovery, and may lack or have lost basic life skills such as budgeting, arriving at work on time, maintaining employment, cooperating with family members, and managing their own lives. The rules of democratic self-governance and financial self-sufficiency enhance self-esteem while teaching or reteaching these basic life and social skills. All members must contribute equally to the expenses of the house; this also fosters self-esteem by requiring members to care for themselves and not rely financially on others. The houses are intentionally mixed by race, age and economic background; this reinforces the knowledge that drug and alcohol addiction are diseases that strike all segments of society. Several witnesses explained the differences in therapeutic benefit from an Oxford House type of setting as opposed to a half-way house: in a supervised setting the residents are both policed and cared for by the staff; in an Oxford House setting the members must care for themselves, and must police and provide support for one another. This dual role of mutual support and mutual-policing is based on the success shown by Alcoholics Anonymous and similar programs, which have consistently demonstrated that persons who have suffered the same problems are the best able to help others going through similar recovery efforts, both by providing a supporting and understanding environment, but also by knowing the temptations and signs of relapse, and helping others avoid such failures.[1]
10. The Missouri Department believes that a full range of treatment options is necessary for the treatment of drug and alcohol abuse, and therefore supports (and funds, at varying levels) a continuum of treatment options including inpatient treatment, supervised half-way houses, Oxford Houses, and outpatient treatment, including Alcoholics Anonymous and Narcotics Anonymous. On the continuum from inpatient treatment to independent living, Oxford Houses provide a final stop for those not quite ready to face alone the risks of independent living. In general, Oxford House residents are well along the recovery path at the time they enter the Oxford House. They usually have undergone one or more treatment programs and have had some period of sobriety before *1564 entering the Oxford House. Often they come from inpatient treatment centers or half-way houses.
The evidence showed that there are almost 300,000 individuals in the State of Missouri who abuse alcohol and/or drugs, including over 100,000 in the eastern region of the state and almost 30,000 in the City of St. Louis. According to the Director of the Missouri Division of Alcohol and Drug Abuse, there is a tremendous need for Oxford Houses in the treatment continuum for alcoholics and addicts in the St. Louis area and across the state.
11. Under the Oxford House program, individual Oxford Houses are located in clean, drug-free, residential neighborhoods that will provide residents with a sense of pride and self-worth. Although it is not possible to find neighborhoods where there are no liquor stores or taverns, as they are everywhere, the program seeks to find neighborhoods that are not dominated by bars and liquor stores. It is important to locate the houses in areas that are relatively free of drug-dealing, because of the temptations that the presence of open drug trafficking can create. The houses should not be isolated in industrial areas away from other neighbors, as location in good neighborhoods plays a crucial role in an individual's recovery and re-entry to society by promoting self-esteem and helping to create an incentive not to relapse. Additionally it is helpful if the houses can be located in neighborhoods with good access to public transportation and AA/NA meeting sites.
The program prefers to use larger single-family houses, as this provides the family atmosphere desired, and because cooperative living is required. The members of each house are expected to share kitchen facilities and to share in the cleaning and upkeep of the house and yard. In almost all Oxford Houses, including those at issue here, the residents are required to share a bedroom, and no locks are allowed on bedroom doors, in order to avoid the possibility that one member could become withdrawn from the group and face a greater risk of relapse. Apartments obviously do not meet these goals of cooperative living and having a large group to provide support. Smaller houses are unsatisfactory because they cannot hold as many residents.[2]
12. Since 1989, the Missouri Department has helped to establish twenty-seven Oxford Houses in Missouri, including nineteen homes for men, six for women, and two for women with children. In 1990 representatives of the Missouri Department met with William Kuehling, special assistant to the Mayor of the City of St. Louis, to discuss the Oxford House concept and to ask for the City's assistance in locating Oxford Houses in the City. Mr. Kuehling expressed some skepticism about the concept, explaining to the state officials that his job was to keep people from leaving the City and that Oxford Houses might cause more people to flee to the suburbs. The representatives from the Missouri Department left this meeting believing that the City would not provide them with any assistance, and they accordingly have never notified any City official prior to the opening of any Oxford House in the City. Six of the Missouri Oxford Houses are located in the City of St. Louis; two are located in suburbs in the St. Louis metropolitan area.

III. Oxford House-Clayton

13. In early 1991 Nkosi Halim, a housing coordinator employed by the Division of Alcohol and Drug Abuse who had formerly been employed by Oxford House, Inc., and who is himself a recovering alcoholic and former Oxford House resident, sought sites for an Oxford House in St. Louis. He noticed that the home on Clayton Road that ultimately became OH-C was for sale. It is located in an "A" single-family zoning district, although a commercial area is directly across the street and the house itself sits only a few doors from the City limit and a *1565 commercial area in the City of Clayton, Missouri. Mr. Halim believed the house to be suitable for an Oxford house because it had at least five bedrooms, was located in a stable residential neighborhood which was accessible to public transportation and was near several hospitals where AA and NA held meetings. He also believed that the amenities available in nearby Forest Park would be of benefit to the residents. He therefore entered into negotiations with the record owners of the building, the Franciscan Sisters of Mary, a religious order. The Sisters had previously used the residence as a home for nuns, and at least five nuns had lived there as recently as 1990. The Sisters indicated that they did not wish to rent the home to Oxford House, but preferred to sell it. As Oxford Houses prefer to rent, rather than own homes, Mr. Halim ultimately located Karen Myers, who entered into a lease-purchase agreement with the Franciscan Sisters of Mary and then in turn leased the property to Oxford House.
14. On or about February 26, 1991, OH-C received a start-up loan of $4,000.00 from the revolving fund established by the Missouri Department. The proceeds of that loan were used to pay for the security deposit, first month's rent, and beds and dressers for the house. In March of 1991 the first residents moved into OH-C. All were recovering alcoholics and drug addicts. Initially eleven members lived in the home; at the time of trial the house had ten members (the reduction was a result of building code requirements related to the ceiling height of a basement bedroom). OH-C functions according to the Oxford House rules. The residents share household expenses, chores and decision making. It has elected officers and weekly meetings where the house's affairs are discussed. Each resident is required to pay rent of $60 per week. Each is required to pay one week's rent in advance, as a "sobriety deposit". If the member leaves the house after notice and in good standing, the deposit is refunded. If the member is expelled for any reason or leaves without giving notice, the deposit is not refunded.
15. Shortly after OH-C opened, the officers of a nearby neighborhood association received questions about the house, and one of the officers of the organization called the alderman for the neighborhood, Daniel McGuire, who told her it was an Oxford House. On April 22, 1991, the neighborhood association held a meeting for the purpose of discussing the Oxford House. OH-C was notified in advance of the meeting and Nkosi Halim, Joe Page, and a representative from the state appeared at the meeting and answered neighbors' questions. Concerns expressed at the meeting by the persons attending included increased crime, whether the residents are screened for criminal records[3], whether any convicted rapists lived in OH-C, and whether children would continue to be safe in the neighborhood. One person attending the meeting, who was among the most vocal, seemed primarily concerned about the amount of rent being paid and the sales price of the house.
Alderman McGuire received reports about the neighborhood meeting from one or more officers of the association. The association's board members continued to discuss Oxford House and contact Alderman McGuire for several months after the special meeting. Alderman McGuire also talked to other OH-C neighbors who expressed fears about property values, overcrowding, and the safety of neighborhood children.
16. On April 22, 1991 (the same date as the neighborhood meeting) the City's Citizens Service Bureau (CSB) received a complaint that the building rented by OH-C had "been turned into a halfway house" and had "not been inspected for Conservation District."[4] As a result of this complaint a city *1566 inspector, Paul Sims, went to the house and told the resident who answered the door that he was investigating a report that the house had been turned into an "illegal halfway house." The resident did not let him in, so he performed only an exterior inspection. Thereafter, the City sent a violation letter to the Franciscan Sisters[5] informing them that they needed to obtain an occupancy permit, because the building was being used for an "institutional group use." According to the City's evidence, this violation notice was "abated" because Mr. Sims later concluded (for some reason that is not clear from the evidence), that only four people were living in OH-C and therefore no institutional use occupancy permit was needed. However, there is no evidence that the Franciscan Sisters or the residents of OH-C were notified that this violation notice had been "abated," and, in any event, the issue was turned over to the City's Building Division.
17. When the Franciscan Sisters were informed that OH-C had been cited for City ordinance violations, they notified OH-C; Nkosi Halim then contacted the City, speaking to Walter Murphy of the Building Division. Halim told Murphy what the OH-C was, sent him information about Oxford Houses, and asked that he be contacted about any further problems. Murphy, however, did not contact Halim, but instead sent follow-up violation notices to the record owners, the Franciscan Sisters, informing them that OH-C was operating in violation of the City's zoning code. Murphy continued to investigate OH-C, after discussing the case with his supervisors. He and inspector Martin Wente went to OH-C at least four times, but only inspected the interior on one occasion. After that inspection, the City notified the Sisters, by letter dated July 18, 1991, of the following claimed violations:
(1) the basement bedroom had a ceiling height of less than 7'4", as required by city code ES 404.4;[6]
(2) the window areas in the basement bedroom were insufficient as they must be at least 8% of the floor area, under ES 401.2; and
(3) "Does not conform to A single-family dwelling district use; Illegal use of premise, cease illegal use. Ord. 59979."
Thereafter various discussions between the parties ensued, which culminated in the City's filing an information in the Municipal Division of the Circuit Court of the City of St. Louis, charging the Franciscan Sisters of Mary with the same three violations. That information was held in abeyance pending resolution of the instant law suit. As a result of the building code violation citations, OH-C removed a cover over a window, resolving the window area dispute, and ceased using the basement room as a bedroom.[7] OH-C never applied for a variance under the City's zoning code.
18. In pursuing the "halfway house" complaint regarding OH-C, Mr. Murphy was aware of community opposition to the Oxford House, from discussions he had with David Bohm, associate city counselor, and other city officials. According to Mr. Murphy, the neighbors did not have complaints about specific problems, but "concern for the idea that a drug rehab house was in their neighborhood." Murphy also felt that there was concern because OH-C had a "multi-racial population." The decision to cite OH-C for violation of the zoning code was actually made by Edward Dobbs, the City's Zoning Administrator. Murphy told Dobbs that the property was some sort of drug rehab center and asked Dobbs "if we were heading in a right direction if we found overcrowding, if that's what we could use." During his deposition, *1567 Mr. Dobbs testified that he "wouldn't want them living next door to him". His explanation for this comment, when ordered by the Court to answer follow-up questions, included common, stereotypical fears such as safety, transiency, and a negative effect on property values.

IV. Oxford House-Westminster

19. On or about April 17, 1992, OH-W received a start-up loan of $4,000.00 from the revolving fund established by the Missouri Department. The proceeds of that loan were used to pay for the security deposit, first month's rent, and beds and dressers for the house. OH-W is located in the Central West End area of the City of St. Louis, and is on a residential street, zoned "A" single-family. It is located on Westminster Avenue, but is only a few houses from Euclid Avenue, which is a restaurant and commercial area. The house has three stories, including six bedrooms and three bathrooms. The Missouri Department learned of the house when someone who knew about the Oxford House program contacted the state and indicated they had a potential house available. The Missouri Department negotiated with the potential owner of the building, and when an agreement on rent was reached the person purchased the building, which had been for sale, and then rented it to Oxford House. The three year lease provides for rent the first year of $1250 per month, with an escalation clause of $25 per month per year.
20. OH-W opened on May 1, 1992, the same day the lease was signed with the new homeowner. Joe Page, an employee of the Missouri Department who is also a former Oxford House resident, was assigned to assist the initial residents of the home, and lived there for several months. At approximately 10:00 a.m. on the day the house opened, Mr. Page answered the doorbell; two men asked him what the Oxford House was. Mr. Page spent several minutes explaining the concept to them and provided them with an informational pamphlet. The neighbors expressed surprise that an Oxford House could operate in a single-family neighborhood; one of the men indicated that he had worked in the alcoholism treatment field and knew who would be living there; the other stated that the area was a conservation district and that a special permit was needed for operation in the district; one of the men expressed concern to Joe Page about the safety of the neighborhood and whether he could allow his daughters to play outside if the Oxford House operated in the neighborhood (expressed by this neighbor at trial as the "normal concerns that any father would have"). Later that evening Mr. Page observed a group of six to eight people gathered outside the house across the street from OH-W; they appeared to be gesturing toward the house. Mr. Page found this intimidating, and left the house through the back door.
21. The next day, May 2, 1992, the neighborhood group that included the houses surrounding OH-W held their annual alley clean up and picnic, at which time several residents expressed concerns about the opening of OH-W to their alderman, Daniel McGuire (the same alderman in whose ward OH-C is located). McGuire sent a letter, dated May 1, 1992, to the president of the Central West End Association citing the zoning code and state statute, discussing the ownership of OH-W, and stating that federal law required that OH-W must be treated as a single family under state and federal law, so long as it had fewer than nine residents. The letter also enclosed a copy of the original complaint in this suit, and expressed the hope that OH-W could be added to the lawsuit. At trial Alderman McGuire denied preparing this letter in anticipation of OH-W's opening, and testified that he believed he had actually mailed the letter after the clean-up and picnic of May 2. He could not recall if he had received advance notice of the opening of OH-W. Alderman McGuire testified at trial that he believed, in May of 1992, that the City Ordinance did not allow more than three unrelated individuals to live together. He testified at his deposition that he believed the City ordinance limiting unrelated persons to three in single-family districts was appropriate. Alderman McGuire provided no explanation for his contrary statements regarding the legality of the three-person restriction *1568 contained in his May 1 letter.[8]
22. Some time after OH-W opened, a representative of Oxford House, Inc. spoke with building inspector Murphy and with City Counselor Bohm about OH-W, and asked that it be allowed to operate with 11 or 12 residents. The City took the position that the request should be handled as an application for a variance under the City's zoning ordinances; Oxford House took the position that it should not be required to participate in variance or conditional use applications. Although there was substantial dispute about this at trial, the Court finds that the parties agreed that the appropriate mechanism for dealing with the alleged violations was for the City to inspect the premises, cite OH-W for the zoning violations, and then OH-W would be joined in the instant suit. That is, in fact, what occurred, and OH-W was joined as a plaintiff by amendment of the complaint in this case. Had it not been so joined, it is clear that the City would have proceeded with enforcement actions regarding the zoning violations.

V. The City Ordinances

23. Title 26 of the Revised Code of the City of St. Louis is the Zoning Code of the City of St. Louis, and consists of a codification of various ordinances enacted at different times. The Zoning Code divides the City into districts, denominated "A" through "L". Section 26.12.010, as amended. Like many Zoning Codes, the St. Louis code is a pyramid-type code, with the activities allowed in each district also being allowed in the next lower group. For example, the "A" single-family residence district is the most restrictive, and allows only single-family residences, with certain exceptions, in that district. All uses allowed in "A" districts are also allowed, however, in almost all of the remaining districts, including B, C, D, E, F, G, H, I, K, and L. (J is an industrial district which provides limitations on dwellings.)
24. The Zoning Code defines "family" to mean "a person, or group of persons immediately related by blood, marriage, or adoption living as a single housekeeping unit; also a group of not more than three (3) persons not necessarily related by blood, marriage, or adoption, living as a single housekeeping unit." Section 26.08.160.
25. At the time OH-C opened, the Zoning Code restricted dwellings in the "A" single-family residence district to single-family residences, that is, to "families" as defined in the code. Thus, OH-C, or any group home for disabled individuals consisting of more than three unrelated individuals, was not allowed as of right in any single-family, or any other residential, district of the City of St. Louis. Moreover, at that time, a group home for the disabled with more than three unrelated individuals was not listed as a conditional use in the single-family district. Such a group home could only have been allowed as of right in the "I" Central Business and "L" Jefferson Memorial districts.
After this suit was filed, but before OH-W opened, the City amended its Zoning Code to comply with state law (see ง 89.020.2 R.S.Mo.), by passing Ordinance 62588, which was approved on April 7, 1992. That ordinance amended ง 26.20.020 to provide that a group house in which eight or fewer unrelated mentally or physically handicapped persons reside (which may also include two additional persons acting as house parents or guardians), may exist as of right in "A" single-family districts, and in all other districts where "A" uses are also authorized.
The amended Zoning Code still provides that group homes in which nine or more unrelated handicapped persons live are permitted as of right only in "I" Central Business Districts, and the "L" Jefferson Memorial District. Under the amended code such group homes are permitted as conditional uses only in "D" Multiple-Family Dwelling Districts, in "E" Multiple-Family Dwelling Districts, "F" Neighborhood Commercial Districts, "G" Local Commercial and Office District, and "H" Area Commercial Districts. Thus a variance would still be required for an Oxford House with more than eight persons *1569 to locate in the "A", single-family, "B", two-family, or "C", multiple-family dwelling districts, and a conditional use permit is required for an Oxford House with more than eight persons to operate in the "D" through "H" districts.
Although Alderman McGuire was the sponsoring alderman of the above-described amendment to the zoning ordinance passed in April of 1992, he claimed at trial to have learned of it only in January or February of 1993, and claimed that he was not aware of it at the time he wrote his letter to the Central West End Association regarding OH-W in May of 1992. He did recall that he had sponsored a "bed and breakfast" ordinance that took effect in April of 1992. In fact, the amendment at issue, Ordinance 62588, also established that a bed and breakfast could be operated as a conditional use in a single-family district, and provided that two baby-sitting centers per block could be located in a single-family district, as of right. Ordinance 62589, effective the same day and also sponsored by Alderman McGuire, established special "bed and breakfast districts."
26. "Conditional uses" under the Zoning Code are not allowed as of right in particular zoning districts; the Zoning Code states that such uses may be allowed when they "may be made compatible or appropriate by attaching certain conditions to their development". Section 26.80.010. According to the ordinance, a conditional use may be granted only if the use is determined, after public hearing, to be not detrimental to public health, safety, morals or general welfare, not to impair property values of the neighboring property, will contribute to, enhance and promote the general welfare and convenience of the specific location, will complement or be compatible with the surrounding uses, and will conform in all other respects to the other applicable zoning regulations.
Section 26.84.010 establishes a board of adjustment which has jurisdiction to consider appeals from aggrieved persons and which is empowered, "where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the Zoning Code, to vary or modify the application of any of the regulations or provisions of such code ... so that the spirit of the code shall be observed, public safety and welfare secured [and] substantial justice done." ง 26.84.050-D. In other words, the Board of Adjustment has the power to grant variances from the zoning code, and can consider appeals from denials of conditional use applications.
Public notices must be given for hearings to consider either conditional use applications or applications for variances. These notices are required to be posted prominently on the premises as well as in the neighborhood where the property involved is located, and must be published in a newspaper of general circulation. Any member of the public may attend the meetings and be heard, and the alderman is notified of the request and is usually asked to provide a statement of support or opposition. In some circumstances either the alderman or other city officials solicit statements of support or opposition from neighborhood groups. Although not stated in the ordinance, a representative of the person requesting the variance or conditional use must appear at the hearing, although counsel is not required, nor is the applicant required to appear personally.
Both plaintiffs and defendants presented expert witnesses who explained both the theory of zoning ordinances, what they were supposed to mean and how they are supposed to operate, and also how the codes are often implemented in practice. Additionally, several fact witnesses testified about how the St. Louis Zoning Code variance and conditional use practice actually operates. From that testimony it is clear that the reality, at least in the City of St. Louis, has little to do with the theory behind zoning codes. The experts agreed that conditional uses are those that should be allowed in a district, but may need to have conditions imposed on them to prevent adverse impact; variances, however, should not be granted for "uses" that are not allowed either as of right or conditionally, but should be reserved for alleviation of hardships that would prevent otherwise approved uses taking place, such as varying the parking requirements, building set-back limits or building height requirements. In other words, the credible evidence *1570 presented by the experts showed that if a specific use (such as a group home for more than eight residents) is not listed as a conditional use in a given district, the variance process should not be used to allow such a use, as this would constitute "spot zoning," which zoning codes are intended to prevent. The credible evidence showed that, under zoning theory, "use variances" should not be granted, because the legislative body, by not listing something as a conditional use, has already determined that such a use should not be allowed in that particular zoning district.
The St. Louis Zoning Code is clearly written with these goals in mind, but the practice shown by the evidence is quite different. The evidence showed that variances and conditional uses are routinely granted or denied based almost entirely on neighborhood and alderman approval or opposition, and not on an analysis of whether the legislative zoning scheme is furthered. Where there is little opposition to a proposed use, whether it is consistent or inconsistent with the intent and purpose of the zoning code, either a variance or conditional use (whichever may be needed to approve the use) will be granted. Where either the neighborhood or the alderman opposes a variance or conditional use, it has only a slim, albeit not impossible, chance of being granted, again with little regard to the factors set forth in the zoning code.
27. The zoning experts presented by the parties testified about the impact that group homes such as the Oxford Houses at issue here have on neighborhoods. Numerous studies have been done on the impact of group homes on their surrounding neighborhoods, including studies of group homes occupied by more than eight residents, group homes occupied by developmentally disabled adults, group homes occupied by recovering alcoholics and addicts, as well as group homes occupied by other "less desirable" occupants such as prison pre-parolees, the seriously mentally ill, and dangerous juveniles. Those data show that group homes with nine or more residents do not have a negative impact on residential character. Most of the studies have focused on impact on property values, and have shown that there is no impact on such values. The studies have also shown that the presence of group homes has not had an impact on crime, safety, traffic, utilities, noise, or parking. The experts for both sides agreed that group homes are residential uses compatible with residential neighborhoods.
28. The only evidence that the presence of OH-C and OH-W had affected their respective neighborhoods was that OH-C had requested that the City install an extra dumpster in the alley behind that house, and that OH-W residents had been concerned about the availability of parking. The installation of the additional dumpster alleviated any problems that may have been caused by the presence of ten residents in OH-C. OH-W, because it is near a popular restaurant and commercial area, is in an area with long-standing parking problems. After the parking problem became apparent to them, the OH-W residents agreed among themselves that no more than four members would park cars on their street, and other members must park some distance away. The evidence showed that this had resolved any parking problem, and, in any event, all the evidence showed that the parking problems on the OH-W street had predated the opening of that home.
29. St. Louis's Existing Structures Code places certain person-per-bedroom or person-per-square-foot limitations on all residences. OH-C and OH-W at their current levels of occupancy comply with those standards. OH-C, when it had eleven residents, including one who stayed in a basement bedroom, violated ES 404.4, the ceiling height restriction. This violation has been cured by OH-C's ceasing to use that area as a bedroom. The other building code violation for which OH-C was cited, involving window areas in the basement, was cured by the simple expediency of removing plywood covers from the basement windows. The evidence showed that the latter was probably not a violation of the code, as artificial light was adequate, and that both alleged violations had been in existence when the Franciscan Sisters occupied the property, but they had never been cited. Both OH-C and OH-W are currently in full compliance with the *1571 City's building codes. The evidence also showed that the City enforces its building code with regard to interior violations only when it receives a complaint or is inspecting the premises for some other reason.

VI. Financial Viability

30. As mentioned previously, a great deal of evidence at trial was devoted to the appropriate size of an Oxford House, both from a therapeutic and from a financial viewpoint. The City ordinance obviously would allow either of these Oxford Houses to continue to operate as of right so long as they had no more than eight residents. It is the position of the plaintiffs, however, that these houses could not survive with only eight residents, and that limiting any Oxford House to eight residents violates federal law. The City argues that affordable housing could be found that would allow Oxford Houses to meet their goals with only eight members, and that OH-C and OH-W in fact are simply paying too much rent for their properties and spending too much money on nonnecessity items. From all the evidence presented, the undersigned finds as follows with respect to this size/financial viability issue.
Clearly, Oxford Houses should not have fewer than six members to provide the necessary therapeutic value, and the optimal size is somewhere between eight and fifteen residents. The five and six bedroom homes here were rented for $1200 and $1250 per month, respectively. Both leases contain escalation clauses, indicating that the rents can be expected to go up in the future. These rents are not excessive for the size and condition of the houses provided in the locations provided, and these houses and locations meet the Oxford House goals of being good houses in established, middle-class neighborhoods, near transportation and readily accessible to AA and NA meeting sites.
The residents of OH-C and OH-W each pay $60 per week as rent, which, of course, covers more than the rent paid to the landlord, and includes such things as utilities, maintenance and general household supplies. This $60 figure is the minimum reasonably necessary to support each house if OH-C maintains ten members and OH-W maintains twelve members. The $60 figure is also the maximum, or near the maximum, that the typical resident of an Oxford House in the St. Louis metropolitan area can be expected to pay.[9] The evidence showed that neither of these houses could survive financially with fewer members, and the members could not reasonably be expected to pay more.[10] The City argues that smaller houses could be found in acceptable locations that could be afforded by only eight residents, but this argument is not supported by the evidence presented, which clearly established that these Oxford Houses could not survive with eight members. The evidence did show that there is an ample supply of five to six bedroom rental houses available in good neighborhoods like those at issue here that rent in the $1200 to $1300 range, and that would be appropriate for Oxford Houses in the ten to twelve member range.

Conclusions of Law[11]
Plaintiffs base their claim on the federal Fair Housing Act, 42 U.S.C. งง 3601 et seq., the Rehabilitation Act of 1973, 29 U.S.C. ง 794, the Housing and Community Development Act of 1974, 42 U.S.C. งง 5301 et seq., the equal protection guarantee of the Fourteenth Amendment, and 42 U.S.C. ง 1983. The Court has jurisdiction of this action under 28 U.S.C. งง 1331 and 1343(a)(3) and (4) and 42 U.S.C. ง 3613. The undersigned has *1572 authority to decide this case by virtue of 28 U.S.C. ง 636(c). Plaintiffs seek a declaratory judgment providing that the City's zoning and building code enforcement with respect to the Oxford Houses violates the plaintiffs' rights under the statutory and constitutional provisions cited above. They also seek an injunction providing that the City be permanently enjoined from enforcing its zoning and building codes with respect to the Oxford Houses, and seek attorneys fees and costs under the statutes.[12]

I. Fair Housing Act

A. Standing

As an initial matter, the Court notes that defendant has challenged the standing of Oxford House, Inc., but has not challenged the standing of the individual Oxford Houses or their residents. It is clear that the residents of OH-C and OH-W are recovering alcoholics and addicts, and are therefore persons with handicaps within the meaning of 42 U.S.C. งง 3602(h), 3604. See United States v. Southern Management Corp., 955 F.2d 914 (4th Cir.1992); Oxford House, Inc. v. Township of Cherry Hill, 799 F.Supp. 450, 459 (D.N.J.1992); United States v. Borough of Audubon, 797 F.Supp. 353, 358-59 (D.N.J.1991); see also 24 C.F.R. ง 100.201 (1990). The individual Oxford Houses are the direct objects of governmental action that will injure them and that a favorable judgment in this matter would redress, and so they also meet the test for standing under Lujan v. Defenders of Wildlife, ___ U.S. ___, ___, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992).
Defendant argues that Oxford House, Inc. lacks standing to bring the instant lawsuit. The United States Supreme Court has given standing under the Fair Housing Act the broadest possible definition consistent with Article III. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 98, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972). Community residents and fair housing organizations are permitted to bring suit and obtain relief. See Havens, 455 U.S. at 379, 102 S.Ct. at 1124; Growth Horizons, Inc. v. Delaware County, 983 F.2d 1277, 1281-82 (3rd Cir. 1993); Hope, Inc., v. County of DuPage, 717 F.2d 1061, 1074 (7th Cir.1983).
Oxford House, Inc. has individual standing to bring the instant lawsuit. The actions taken by defendant that are alleged to be discriminatory have "perceptibly impaired" Oxford House, Inc. from fulfilling its objectives of providing fair and equal housing for persons recovering from alcoholism and drug addiction. Oxford House, Inc.'s contract with the State of Missouri for collection of start-up loan repayments and assistance to individual Oxford Houses is directly affected by the City's actions, which, if upheld, could cause the failure of the Oxford Houses at issue here and could thereby jeopardize Oxford House, Inc.'s performance of its contract with the State. Additionally, the role Oxford House, Inc. plays as legal advocate for recovering addicts and alcoholics results in a substantial drain on its organizational resources. Cf. Havens, 455 U.S. at 379, 102 S.Ct. at 1124.

B. Constitutionality and Applicability of the Fair Housing Act

Defendant first argues that if the provisions of ง 3604 apply in the manner urged by plaintiffs here, the statute is unconstitutional. Defendant raised this issue in its motion to dismiss and to strike plaintiff's first amended complaint, which was denied without prejudice, and reiterated it in its post-trial brief. The Court allowed the United States to intervene under Rule 24(a), Fed.R.Civ.P., for the purpose of challenging this assertion of unconstitutionality, and the United States has filed a brief in support of the statute's constitutionality.[13]
*1573 The Court agrees with the United States that the constitutionality of the 1988 amendments to the Fair Housing Act cannot be seriously questioned. Congress has broad power under the commerce clause to regulate activities that affect interstate commerce. See, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 276-77, 281, 101 S.Ct. 2352, 2360-61, 2362, 69 L.Ed.2d 1 (1981). A court reviewing legislation "must defer to a congressional finding that a regulated activity affects interstate commerce if there is any rational basis for such a finding." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 17, 110 S.Ct. 914, 924, 108 L.Ed.2d 1 (1990), quoting Hodel, 452 U.S. at 276, 101 S.Ct. at 2360. Here Congress determined, in 1968 when it passed the original Fair Housing Act, that discrimination in housing affected interstate commerce. When Congress passed the 1988 amendments, it did no more than extend the prior determination of the effect of housing discrimination on interstate commerce to other forms of housing discrimination. If housing discrimination on the basis of race and other factors affects interstate commerce, such discrimination on the basis of handicapped status also clearly is within Congress's commerce power. See Seniors Civil Liberties Ass'n v. Kemp, 965 F.2d 1030, 1034-35 (11th Cir.1992) (upholding constitutionality of 1988 amendment provisions prohibiting discrimination based on familial status); see also Russell v. United States, 471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985) ("the rental of real estate is unquestionably ... an activity" affecting interstate commerce).
Defendant next argues that its actions are exempt from the coverage of the Fair Housing Act by virtue of 42 U.S.C. ง 3607(b)(1), which exempts "reasonable local, State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." Defendant contends that its single-family restriction of not more than three unrelated individuals, in the old ordinance, or not more than three unrelated individuals or eight handicapped individuals with two unrelated caretakers, in the new ordinance, are simply reasonable local restrictions on the "maximum number of occupants" allowed to reside in a dwelling in the single-family district. Neither the old nor the new ordinance, of course, places any limit on the total number of individuals who may occupy a dwelling, as a related family of six or sixteen or twenty-six individuals would be allowed, although only three unrelated non-handicapped or ten unrelated handicapped persons and their caretakers would be allowed.[14]
The legislative history of the 1988 Fair Housing Act amendments, which first added discrimination against the handicapped as a prohibited form of housing discrimination, indicates that Congress intended those amendments to:
prohibit special restrictive covenants or other terms or conditions, or denials of service because of an individual's handicap and which have the effect of excluding, for example, congregate living arrangements for persons with handicaps.

H.R.Rep., No. 711, 100th Cong., 2d sess. 23, reprinted in 1988 U.S.Code Cong. & Admin.News 2173, at 2184 (hereafter referred to as "House Report") (emphasis added). The House Report goes on to discuss the specific ง 3607 exemption raised here as follows:
A number of jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit. Reasonable limitations by governments would be allowed to continue, as long as they were applied to all occupants, and did not operate to discriminate on the base of race, color, religion, sex, national origin, handicap or familial status.
Id. at 2192 (emphasis added). Thus, the legislative history on the one hand explicitly recognized the need for congregate housing for the handicapped, and then went on to *1574 stress that reasonable maximums could apply, so long as they applied equally to all occupants, without discrimination on the basis of one of the protected categories.
Exemptions to the Fair Housing Act are to be narrowly construed, and the burden of proving that an exemption applies rests with the party asserting the exemption. See, e.g., United States v. Columbus Country Club, 915 F.2d 877, 882-83 (3d Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2797, 115 L.Ed.2d 971 (1991). When the exemption contained in ง 3607 is narrowly construed, it simply cannot be read to say what it does not say, and the City has not met its burden of showing that it applies here. The City's ordinance is a classic unrelated person provision of the type frequently found in zoning codes; the ง 3607 exemption clearly applies not to this type of zoning code but to building and occupancy codes reasonably designed to prevent overcrowding of dwellings, such as those contained in the City of St. Louis's Existing Structures Code. The zoning ordinance here does nothing to restrict the maximum number of occupants in a dwelling; it simply restricts the maximum number of certain types of occupants.
Although the City's argument was accepted by the Eleventh Circuit in Elliott v. City of Athens, 960 F.2d 975 (11th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992), the undersigned agrees with the District Courts in Oxford House, Inc. v. City of Virginia Beach, 825 F.Supp. 1251 (E.D.Va.1993), and Parish of Jefferson, v. Allied Health Care, Inc., 1992 WL 142574 1992 U.S.Dist. LEXIS 9124 (E.D.La. June 10, 1992), that the reasoning of Elliott is not persuasive. Elliott largely based its decision on case law upholding the constitutionality of "related persons" restrictions, but, in the opinion of the undersigned, Elliott misinterpreted not only those cases but also the legislative history of the 1988 amendments to the Fair Housing Act.
In Elliott the Eleventh Circuit interpreted Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), as holding that all maximum occupancy standards are unconstitutional when applied to families. Since the Supreme Court had upheld the constitutionality of unrelated person ordinances in Village of Belle Torre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), Elliott read the two cases together to say that zoning regulations limiting the number of unrelated persons, but not related persons, were lawful, and that Congress must have passed the exemption with this interpretation in mind. Elliott then reasoned that the ง 3607 exemption would be a nullity if it only applied to overcrowding regulations, since, as the Eleventh Circuit panel read Moore, such regulation would be invalid if applied to families. Elliott then concluded that the exemption should instead be read to apply to unrelated person rules such as that at issue here. The flaw in this logic, of course, is that Moore did not hold that no occupancy limits could apply to families. Moore merely invalidated an ordinance that preferred nuclear families over extended families in single-family settings. The Supreme Court in Moore found that the ordinance at issue there did not promote the stated goal of preventing overcrowding, and "found significant" that the City already had a maximum occupancy provision "specifically addressed to the problem of overcrowding." Moore, 431 U.S. at 500 n. 7, 97 S.Ct. at 1936 n. 7. The undersigned must conclude that Elliott simply misinterpreted Moore, and will not follow it in this case. The Court also notes that the Eighth Circuit has not addressed this precise argument, but has interpreted ง 3607, in a slightly different context, to mean what it says, that is, that Congress intended that a government could place reasonable limits on the number of people occupying a given amount of space. See United States v. Badgett, 976 F.2d 1176, 1179 (8th Cir.1992).
Defendant also contends that it cannot be held liable because it was neither the seller nor renter of the property. Section 3604 provides that it shall be unlawful:
(f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap ...
(2) To discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision *1575 of services or facilities in connection with such dwelling, because of a handicap ...
(3) For purposes of this subsection, discrimination includes ...
(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to allow such person equal opportunity to use and enjoy a dwelling ...
42 U.S.C. ง 3604(f). Section 3604(f)(1)'s use of the phrase "otherwise make unavailable or deny," as well as the legislative history, makes clear that the section applies not only to sellers or landlords, but also to more sophisticated methods of denying housing such as enforcing zoning or other land use laws which have the effect of denying housing. See House Report, at 2185 ("The Committee intends that the prohibition against discrimination against those with handicaps to apply to zoning decisions and practices"); see also United States v. City of Black Jack, 508 F.2d 1179, 1183-84 (8th Cir.1974), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); In re Malone, 592 F.Supp. 1135 (E.D.Mo.1984), aff'd without op. 794 F.2d 680 (8th Cir.1986). Clearly the Fair Housing Act and its Amendments apply to the zoning enforcement decision at issue here.

C. The ง 3604 Claims As to the Zoning Ordinance

Plaintiffs urge that they have shown both intentional discrimination and discriminatory effect in the application of defendant's zoning ordinances. Plaintiffs also urge that they have shown that defendant failed to reasonably accommodate their handicap. A plaintiff may prove a violation of the Fair Housing Act by showing either intentional discrimination or discriminatory effect in the enforcement of the City's zoning codes, see Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 933 (2d Cir.) aff'd, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam); City of Black Jack, 508 F.2d at 1185 ("effect, and not motivation, is the touchstone" of a Fair Housing Act claim); see also Familystyle of St. Paul, Inc. v. City of St. Paul, 923 F.2d 91, 94 (8th Cir.1991). A violation may also be proven by showing that the City refused to make reasonable accommodations necessary to afford persons with disabilities equal housing opportunities. See 42 U.S.C. ง 3604(f)(3)(B); Oxford House, Inc. v. Township of Cherry Hill, 799 F.Supp. at 461-63; Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Commission, 790 F.Supp. 1197 (D.Conn.1992).
For the reasons that follow, the Court concludes that plaintiffs have met their burden of showing that defendant's enforcement of its zoning ordinance unlawfully discriminates against them on the basis of their handicap, under all three tests.

1. Intentional Discrimination

To prevail on a claim of intentional discrimination, plaintiff may either present direct evidence or may attempt to prove discrimination under the standards of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Eighth Circuit has held "that the three-stage McDonnell Douglas/Burdine analysis applies to Fair Housing Act cases." Ring v. First Interstate Mortgage, Inc., 984 F.2d 924, 926 (8th Cir.1993), citing United States v. Badgett, 976 F.2d 1176, 1178 (8th Cir.1992). Even under a McDonnell Douglas/Burdine analysis, however, the fact finder still must determine that the challenged action was a result of prohibited discrimination. See St. Mary's Honor Center v. Hicks, ___ U.S. ___, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Because plaintiffs here have provided direct evidence of discrimination, the Court need not utilize the three stage McDonnell Douglas/Burdine burden-shifting analysis.
Intentional discrimination can include actions motivated by stereotypes, unfounded fears, misperceptions, and "archaic *1576 attitudes", as well as simple prejudice about people with disabilities. See School Board of Nassau County v. Arline, 480 U.S. 273, 279, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987). To show intentional discrimination it is not necessary that plaintiffs prove that defendant's actions were motivated by a malicious desire to discriminate. It is enough that the actions were motivated by or based on consideration of the protected status itself. See Stewart B. McKinney Foundation, 790 F.Supp. at 1210-11.
The evidence here showed that city officials responded to the presence of the Oxford Houses based on stereotypical fears of recovering addicts and alcoholics, and carried out their enforcement efforts in response to neighborhood and community fears and concerns about "some sort of drug rehab" house being in the two neighborhoods. In short, the evidence clearly showed that defendant's actions were motivated by consideration of plaintiffs' handicapped status. The City's reaction to the state's introduction of the concept was that Oxford Houses would cause flight from the City. The City's Zoning Administrator, who was its top zoning official, testified that he wouldn't want recovering alcoholics or addicts living next door to him. The chief building inspector sought guidance from this same Zoning Administrator by asking him if pursuing a complaint of overcrowding would be "heading in a right direction ..., if that's what we could use" to stop the operation of the Oxford House. The first city inspection of OH-C occurred on the same day the neighborhood meeting regarding OH-C was held, in which unfounded and stereotypical fears about safety and property values were raised by the neighbors. The evidence showed that multiple inspections were conducted, and OH-C was cited for at least one non-existent (conservation district) violation. After suit was filed, the City belatedly amended its ordinance to comply with the minimum requirements of state law, but did so in a way that would still preclude OH-C from remaining in its single-family district. When OH-W opened, the City continued its pattern of attempting to enforce the ordinance to exclude the Oxford House and continued its pattern of responding to unfounded and stereotypical fears of the neighbors. The City alderman was able to send a letter to his constituents about OH-W the same day the house opened, expressing his hopes that the house could be prevented from operating.
Completely absent from the City's reaction was any attempt to assuage the fears expressed by the citizens: that is, rather than attempting to explain the benefits of the Oxford House program and the laws governing non-discrimination against the handicapped, the various city officials fanned the unfounded fears of the residents by assuring them that they would fight the presence of the Oxford Houses. This reaction and the City's efforts at enforcement, rather than accommodation, shows intentional discrimination.[15] "[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decision making process ..." Association of Relatives and Friends of AIDS Patients v. Regulations & Permits Admin., 740 F.Supp. 95, 104 (D.P.R.1990). The clear inference from all the evidence presented is that if the residents of these Oxford Houses had been a desirable group of non-handicapped persons, for example, the nuns who lived in OH-C before in numbers exceeding the zoning code limits or a family including unadopted foster children, the City would not have enforced its zoning ordinance against them. The Court recognizes that the evidence of intentional discrimination in this case is not nearly so strong as in some of the cases relied on by plaintiffs, such as Support Ministries for Persons with AIDS, Inc. v. *1577 Village of Waterford, 808 F.Supp. 120 (N.D.N.Y 1992), where, for example, City leaders made numerous blatantly discriminatory statements at public forums and passed new ordinances for the explicit purpose of keeping handicapped persons out of their community. The fact that public officials in other cities have behaved worse, however, does not excuse the intentional discrimination shown here.
The Court is not unmindful that defendant presented significant testimony from its various witnesses and decision makers that they, like most members of our society, have had some personal involvement with alcoholism or addiction, most often through close friends or relatives who suffered from these disabilities. These witnesses all testified that they themselves held no animosity towards recovering alcoholics or addicts, and, in some cases, that they had provided support and guidance when their own loved ones were struggling with recovery. Although the Court has no doubt as to the sincerity of this testimony, it misses the mark as to whether defendant intentionally discriminated against plaintiffs in the enforcement of its zoning codes. Intentional discrimination does not require personal animosity or ill will โ it is sufficient that defendant treated plaintiffs unfavorably because of their handicap. It does not matter that defendant's individual witnesses feel sympathy to plaintiffs' plight, when defendant sought to exclude plaintiffs from equal housing opportunity because of their handicap.
The Court is also aware that the State of Missouri cannot entirely escape criticism for its apparent concentration of the Oxford Houses in the City of St. Louis, rather than in the surrounding suburban areas. From the evidence presented it appears that this was not coincidental, and may, in fact, be based on some unfair (but not necessarily unlawful) stereotyping engaged in by the State officials themselves, who may believe that City residents would be less likely to complain or to have their complaints listened to than would their more well-to-do suburban neighbors. The City's fears of flight to the suburbs are not baseless, especially in today's political and economic climate, and the Court finds the City's fear that it was being unduly singled out for an over-concentration of social service institutions has some basis in fact. These concerns, however, do not justify discrimination against the handicapped. Simply put, the complaint of "no more in my back yard" is just as unacceptable an excuse for discrimination against the handicapped as the discriminatory cry of "not in my back yard." See Horizon House Developmental Services, Inc. v. Township of Upper Southampton, 804 F.Supp. 683, 698 (E.D.Pa.1992) ("the FHAA rejects any notion that a Township can somehow avoid the anti-discrimination mandate by accepting some sort of `fair share' or apportionment of people with disabilities"), aff'd 995 F.2d 217 (3rd Cir.1993).

2. Discriminatory Impact

Under the standards established by the Eighth Circuit, to prevail on a discriminatory impact theory, plaintiff must first make a prima facie showing that the challenged ordinance has a discriminatory effect. See Familystyle, 923 F.2d at 94; City of Black Jack, 508 F.2d at 1185. "If the law has such an effect, the burden shifts to the governmental defendant to demonstrate that its conduct was necessary to promote a governmental interest commensurate with the level of scrutiny afforded the class of people affected by the law under the equal protection clause." Familystyle, 923 F.2d at 94. In Familystyle the Eighth Circuit concluded that handicapped persons are not members of a suspect class, relying on City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985), and therefore held that the proper level of scrutiny is whether the legislation is "rationally related to a legitimate government purpose." Id.[16]
*1578 Applying that analysis to the application of the zoning ordinances here, it is clear that plaintiffs have made a prima facie showing of discriminatory effect. First, the zoning ordinance in effect when OH-C opened and this case was filed clearly had a disparate impact upon handicapped persons by severely limiting the housing available to them. That ordinance allowed no group homes for the handicapped as of right in any residential zoning district. At the time OH-C was cited, a group home for more than three unrelated individuals with disabilities could not operate as a matter of right in any zoning district in the City of St. Louis other than the "I" Central Business District and "L" Jefferson Memorial District. The City has argued that the ordinance was non-discriminatory because it applied equally to handicapped and non-handicapped unrelated persons. Although facially neutral, however, the ordinance was enforced in a discriminatory manner and had a disparate effect on handicapped persons. Plaintiffs presented evidence that the City had not prosecuted various religious orders who had more than three unrelated individuals living in single-family districts.[17]
There can be no doubt that the effect of the City's three-person rule limited the ability of handicapped persons to live in the residence of their choice in the community. The evidence at trial showed that while groups of unrelated non-disabled people may occasionally wish to live together in residential neighborhoods, recovering alcoholics and addicts in the early stages of sobriety need such housing as a result of their disability. Plaintiffs showed that they face a substantial risk of relapse from the isolation of living alone, the stress of living with enabling or using family members, and the peer pressure inherent in returning to their old neighborhoods. Because of their disability, newly recovering alcoholics and addicts often lack the financial and personal resources necessary to return to independent living. For their adequate and continued recovery they need a living arrangement in which a critical mass of recovering individuals may live together in affordable, supportive, drug-free housing in middle-class residential neighborhoods. By definition the Central Business and Jefferson Memorial zoning districts are non-residential areas that are unsuitable for the location of an Oxford House. Limiting the number of Oxford House residents to three or fewer would essentially eviscerate the Oxford House program, from both a therapeutic and financial standpoint. By so severely limiting the numbers of Oxford House residents and the neighborhoods where such houses could locate, defendant's original zoning ordinance essentially made appropriate housing for these handicapped individuals impossible to secure within the City of St. Louis. The zoning ordinance in effect at the time OH-C was cited had a discriminatory impact on handicapped individuals by denying them this necessary housing option.[18]
Moreover, the new city ordinance allowing group homes for up to eight handicapped residents in most of the City's residential neighborhoods has not cured the discrimination, but has, as enforced, continued the discrimination against the handicapped. Because Oxford Houses typically require more than eight residents,[19] the zoning *1579 scheme still prevents them from operating as a matter of right in any residential zoning district in City, indeed, again in any zoning district except the "I" and "L" districts.[20] Plaintiffs presented substantial credible evidence showing that more than eight residents are needed for OH-C and OH-W to operate viably from both a financial and therapeutic viewpoint. Limiting the number to eight would severely limit the Oxford House program's ability to operate successfully, and would require these two successful houses to close.
Congress recognized, in passing the 1988 amendments, that group homes were necessary living arrangements for some handicapped individuals, and that facially neutral policies could be used to deny equal housing to handicapped persons. The legislative history to the 1988 amendments to the Fair Housing act noted that:
While state and local governments have authority to protect safety and health and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. [Citing City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 435, 105 S.Ct. 3249, 3252, 87 L.Ed.2d 313 (1985).] This has been accomplished by such means as the enactment of health, safety or land use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against people with disabilities.
The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community ...
Another method of making housing unavailable to people with disabilities has been the application of enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities. Such discrimination often results from false or over-protective assumptions about the needs of handicapped people, as well as unfounded fears about the problems that their tenancies may pose. These and similar practices would be prohibited.
H.R.Rep., No. 711, 100th Cong., 2d sess. 24, reprinted in 1988 U.S.Code Cong. & Admin.News 2173, at 2185.
Thus, plaintiffs met their burden of showing that both the old and the new city ordinances had a disparate impact on them because of their handicap.[21] The burden then shifts to the City to show that its actions were necessary to promote legitimate governmental interests. Familystyle, 923 F.2d at 94. Under Familystyle, this is a two-part burden: the City must show that it has a legitimate governmental interest it seeks to protect, but it also must show that the scheme at issue was necessary to promote that interest. The Court agrees with defendant that zoning ordinances in general, and single-family-zoning districts in particular, promote the legitimate governmental interest of maintaining the residential character of a neighborhood and segregating single families from rooming houses, multi-family apartments, and commercial or industrial uses in that same area. See, e.g., Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). The city ordinance at issue here, however, as enforced against these plaintiffs, does not promote *1580 those goals, and certainly is not necessary to promote those goals.[22]
The evidence showed that the Oxford Houses at issue here had not caused any adverse impact on the neighborhoods where they are located. Both locations are quite close to non-residential uses, so the argument that the Oxford Houses somehow destroy the single-family residential character of the blocks makes no sense. Doctors offices are located on the same block as OH-W. A commercial area including a gas station and hotel is located across the street from OH-C. Transiency must not be an issue, as two baby-sitting centers per block are allowed as of right and Bed and Breakfasts are conditional uses. The gross number of occupants cannot be the issue, as the same number of grown siblings or cousins would be allowed under the zoning scheme, and a total of ten individuals (the number desired by OH-C) would be allowed under the new ordinance so long as eight were handicapped and two were caretakers: both of these allowed situations, with ten adults, would have the same impact on the neighborhood as the Oxford House. Both houses are well-maintained and the residents have made every effort to be good neighbors โ in one case making sure that their garbage did not overburden the community dumpster, and in the other case voluntarily agreeing to limit the number of residents' cars parking on the street.
The evidence also showed that all scientific studies involving group homes of nine or more demonstrate that such congregate living arrangements have no discernible effect on property values, safety, crime rates, or any other measurable value. From the perspective of the interests the zoning ordinances are intended to address, the presence of OH-C and OH-W with their ten and twelve (as opposed to eight) residents simply does nothing to undermine the City's zoning ordinance. Stated conversely, enforcing the limit of eight residents does not promote the City's asserted governmental interest in maintaining the residential nature of its single-family-zoning district.
The City presented no specific justification for the new ordinance's limit of eight persons, and stated no legitimate interest that allowing eight Oxford House residents, but not ten or twelve, would promote. Even the City's own zoning expert provided no rational explanation for a zoning scheme that would allow eight handicapped persons as of right in the three most restrictive districts ("A" single-family, "B" two-family, and "C" multiple-family) but that would not allow a group home to add even one additional handicapped resident to live in those districts even as a "conditional use." The ordinance is not rational in this regard, as surely if eight handicapped persons are consistent with the "residential character" of the single-family district, nine should, at a minimum, be considered a "conditional use." This irrationality and internal inconsistency of the ordinance itself defeats the City's burden of showing that its ordinance is necessary to protect a legitimate governmental interest, at best, and at worst could be viewed as evidence of intentional discrimination in the legislative process.
The City has argued that its limit of eight plus two caretakers implemented a state policy limiting group homes in single-family neighborhoods to eight residents. As the undersigned held in denying the defendant's earlier motion to dismiss in this case, the state law, ง 89.020, subd. 2, R.S.Mo. (1991), does not provide a ceiling or express a state policy limiting group homes to eight residents, but merely does what it says it does, which is require cities, at a minimum, to treat group homes with eight or fewer handicapped residents as single-family homes.[23]

*1581 3. Reasonable Accommodation

Defendant, of course, could have alleviated the discriminatory effect of even its three-person ordinance (despite its conflict with state law), by making reasonable accommodations for the plaintiffs here. Instead of reasonable accommodation, however, the City responded with enforcement attempts that demonstrated intentional discrimination. Even if, arguendo, the plaintiffs had failed to prove either intentional discrimination or disparate impact, the Court finds that defendant's failure to agree to non-enforcement of the zoning ordinance for OH-C and OH-W violated ง 3604(f)(3)(B) as it was a failure to make a reasonable accommodation necessary to afford these handicapped plaintiffs with an equal opportunity to the housing of their choice.
Failure to make reasonable accommodations is an independent Fair Housing Act violation, and the reasonable accommodation requirement applies to zoning ordinances and their enforcement. See Oxford House, Inc. v. Town of Babylon, 819 F.Supp. 1179 (E.D.N.Y.1993). An accommodation is reasonable if it would not require a fundamental alteration in the nature of a program and if it would not impose undue financial or administrative burdens on the defendant. See Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1383 (3d Cir.1991).
Plaintiffs argue that reasonable accommodations would have required no more than non-enforcement of the zoning ordinances to OH-C and OH-W. Plaintiffs requested that accommodation by the communications Nkosi Halim had with City officials shortly after the City inspectors first showed interest in Oxford House-Clayton, and later by the letters and other communications between Oxford House, Inc., and the City Counsellor's office. Defendant argues that these requests were made to the wrong people, and that the only valid way for plaintiffs to have requested any accommodation was to file a request for a variance.
First, defendant's argument that the requests were not directed to the appropriate decision makers improperly twists the evidence. Halim's requests, both oral and in writing, to Inspector Murphy were met with Murphy's refusal to deal with Halim, and his citation of the record owners for the zoning and building code violations. The City makes no attempt to explain why Murphy, who was actively communicating with his superiors and other City officials on ways to block the Oxford Houses, could not have either passed Halim's request on to the appropriate officials, or have informed Halim who those officials were. Similarly, the letter from Oxford House, Inc.'s lawyer to the City Counsellor could easily have been viewed by the City as a request for reasonable accommodation. The evidence shows that the City was determined to consider no requests for accommodation other than a formal application for a variance. As set forth in more detail below, the Court finds the City's insistence on using the variance process to be misplaced. The Court finds the argument that the reasonable accommodation request was directed to the wrong authorities to be an attempt to obfuscate the issues.
Second, the City's insistence that the only accommodation possible was resort to the variance procedures is not reasonable. Although a variance, if granted, could have allowed an Oxford House with more than eight residents to operate in zones "A" through "C", and a conditional use permit could have allowed operation in zoning districts "D" through "H", plaintiffs cannot lawfully be required to attempt those procedures. Requiring compliance with those procedures in this situation would have a discriminatory effect on plaintiffs. The procedures require a public hearing, public advertisement of the hearing, and the posting of a conspicuous notice on the block and on the *1582 House itself. Plaintiffs presented credible evidence that this process stigmatizes recovering alcoholics and addicts, perpetuates their self-contempt, and increases the stress which can so easily trigger relapse. Accord Stewart B. McKinney Foundation, 790 F.Supp. at 1219-20; Ardmore, Inc. v. City of Akron, 1990 WL 385236 (N.D.Ohio August 2, 1990).
Moreover, the evidence presented showed that aldermanic and community support or opposition have a strong impact on the outcome of applications for conditional uses and variances, and that these Oxford Houses would not have obtained a variance had they sought one. The City's practice is to solicit opposition or support from the alderman and neighborhood organizations, and such opposition or support usually has a determinative effect on whether variances or conditional use permits are approved. The clear inference from the evidence presented was that had plaintiffs participated in the procedures, they not only would have found their own recovery (and thereby their own self-worth) opened up for public debate and the additional airing of stereotypical fears and concerns, but in doing so they would have obtained only a denial of the requested variance or conditional use.[24] The alderman had already expressed his opposition to the neighborhood groups, who had in turn expressed their own stereotypical and unfounded fears of persons suffering from these particular handicaps. The variance process would have provided only a futile remedy, and going through the process may well have caused the very risk of relapse that Oxford House attempts to prevent. Accord, Horizon House, 804 F.Supp. at 692; Township of Cherry Hill, 799 F.Supp. at 462 n. 25.
The Court further finds that the accommodation requested here by OH-C and OH-W was reasonable. The request was simply that the zoning ordinance not be enforced as to these two houses. Compliance with this request for non-enforcement would not have required any fundamental change in defendant's zoning policy, nor would it have imposed any financial or administrative burden on the defendant. In fact, the evidence presented at trial showed that non-enforcement of the zoning code in these instances would have no adverse effect on the City's zoning scheme or on the surrounding neighborhoods. Indeed, the City admitted that it does not enforce its related-party rule in the absence of complaints, so non-enforcement in this situation would not fundamentally change its zoning program. The City's refusal to comply with this request for reasonable accommodation violated the Fair Housing Act.

D. The Building and Occupancy Codes

The Court finds that the plaintiffs did not meet their burden of showing any discrimination in the City's enforcement of its building and occupancy codes, nor did they show that their requested non-enforcement of these codes was a request for reasonable accommodation. Plaintiffs did not show that the ceiling and window requirements enforced against OH-C were enforced in any discriminatory manner or had a disparate impact on handicapped individuals. Moreover, the evidence did not show that by virtue of plaintiffs' handicap they need non-enforcement of these health and safety codes in order to have equal opportunity to housing. Although plaintiffs' expert testified that the ceiling height requirement was not a necessary building code requirement, plaintiffs simply did not show any intentional discrimination or disparate impact in the enforcement of these codes, which are not reasonably related to a legitimate state interest. Plaintiffs are not, simply by virtue of their being handicapped, excused from the reasonable governmental requirements that apply to other members of society. If the City's concern is in fact overcrowding (and not a discriminatory concern about the "types" of people who live in a given building) it certainly can enforce its reasonable building and occupancy codes in a manner to prevent such overcrowding. Requiring a reasonable number *1583 of square feet per occupant or reasonable ceiling heights is well within the City's prerogative, and there is no evidence to justify enjoining the City from continuing such enforcement.

E. The ง 3617 Claim

Plaintiffs also claim that defendant violated ง 818 of the Fair Housing Act, which makes it unlawful "to coerce, intimidate, threaten or interfere with," a person's rights protected under the Act, or to interfere with others who aid or encourage protected persons in the exercise of their rights. A violation of this statute requires plaintiffs to prove four elements: (1) the occupants are members of a protected class; (2) the protected individuals were engaged in the exercise or enjoyment of rights to equal housing or the housing advocate or provider was aiding or encouraging protected individuals in the exercise of their equal housing rights; (3) defendant was motivated by an intent to discriminate; and (4) interference on account of the protected individuals' having exercised their right to live in the neighborhood of their choice. See People Helpers Foundation v. City of Richmond, 781 F.Supp. 1132, 1134 (E.D.Va.1992). Plaintiffs have met their burden of showing each of these elements, as (1) they are handicapped and therefore are members of a protected class; (2) they were engaged or attempted to engage in their exercise of equal housing rights, by attempting to live in a single-family residential neighborhood; (3) defendant was motivated by intentional discrimination, as it acted towards plaintiffs in the way it did because of plaintiffs' status as recovering alcoholics and addicts; and (4) defendant, by refusing to agree to non-enforcement of the zoning ordinances, interfered with plaintiffs' equal housing rights. See Stewart B. McKinney Foundation, supra, 790 F.Supp. at 1221; Oxford House-Evergreen v. Plainfield, 769 F.Supp. 1329, 1344 (D.N.J.1991).

II. The Rehabilitation Act Claim

Section 504 of the Rehabilitation Act, as it was in effect at the time of defendant's actions here, provided that
No otherwise qualified individual with handicaps ... shall, solely by reason of ... his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.
29 U.S.C. ง 794(a).[25] A violation of this statute requires plaintiffs to prove four elements: (1) plaintiffs are handicapped; (2) they are otherwise qualified for participation in the program; (3) the program receives federal financial assistance; and (4) plaintiffs were subjected to discrimination by a program receiving federal financial assistance. See Sullivan v. City of Pittsburg, 811 F.2d 171, 181-82 (3rd Cir.1987). Recovering alcoholics and addicts are handicapped within the meaning of section 504. See 24 C.F.R. ง 8.3; Sullivan, 811 F.2d at 182; Gallagher v. Catto, 778 F.Supp. 570 (D.D.C.1991), aff'd without op. 988 F.2d 1280 (1993); Anderson v. University of Wisconsin, 665 F.Supp. 1372 (W.D.Wise.1987) aff'd 841 F.2d 737 (7th Cir. 1988).
For the same reasons that the Court concluded that plaintiffs had shown discriminatory intent, discriminatory impact, and failure to reasonably accommodate under the Fair Housing Act, the Court finds that plaintiffs are also entitled to relief against defendant on their Rehabilitation Act claim. Because defendant was a recipient of federal Community Development Block Grant funds, its zoning operations constitute a "program or activity receiving federal financial assistance" under the Rehabilitation Act. Since plaintiffs have proven that they were discriminated against in the operation of such a program, they are also entitled to relief under this act.

III. Equal Protection

Plaintiffs also assert that defendant's actions violate the Fourteenth Amendment to the United States Constitution, and that they are entitled to recover under 42 U.S.C. *1584 ง 1983 for this deprivation of their constitutional rights. However, since this Court finds in favor of plaintiffs on statutory grounds, it will decline to address the constitutional claim. It is well settled that a court should "avoid unnecessary constitutional rulings." See, e.g., Support Ministries for Persons with AIDS, Inc., 808 F.Supp. at 138; Association of Relatives and Friends of AIDS Patients, 740 F.Supp. at 107; Baxter v. City of Belleville, 720 F.Supp. 720, 734 (S.D.Ill.1989).

IV. HCDA Claim

Plaintiffs also claim that they were subjected to deprivations of their rights secured by งง 104(b)(2) and 109 of Title I of the Housing and Community Development Act (hereinafter "HCDA"), in violation of 42 U.S.C. ง 1983. Defendant argues that there is no ง 1983 right of action because Congress intended to foreclose such a right of action under the HCDA.
The HCDA does not explicitly provide a right of action for those who allege a violation of its terms. Whether a statutory violation can give rise to a claim under 42 U.S.C. ง 1983 depends on the Congressional intent, as shown under the four-part test promulgated by the Supreme Court in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Under Cort a private right of action exists only if (1) the plaintiff is part of an especial class for whose benefit the statute was enacted; (2) the legislature intended to create a private remedy; (3) a private remedy is consistent with the purposes of the legislation; and (4) the cause of action is not founded on an area "traditionally relegated to state law." Id., 422 U.S. at 78, 95 S.Ct. at 2087.
Here the Court agrees with defendant and with the majority of courts that have considered this issue, and finds that there is no private right of action under the HCDA. The HCDA was not passed for the purpose of preventing discrimination, but rather "was passed in response to Congress' concern for the `critical social, economic and environmental' conditions existing in the nation's cities. The statute's primary objective was `the development of viable urban communities.'" Latinos Unidos De Chelsea v. Secretary of Housing, 799 F.2d 774, 793 (1st Cir.1986) (quoting 42 U.S.C. งง 5301(a) & (c). Thus, plaintiffs are not part of an "especial class" for whose benefit the statute was intended, and no private cause of action should be implied. Id. at 794; see also Nabke v. Department of Housing and Urban Development, 520 F.Supp. 5 (W.D.Mich.1981); People's Housing Development Corp. v. City of Poughkeepsie, 425 F.Supp. 482 (S.D.N.Y. 1976); but see Montgomery Improvement Ass'n v. Department of Housing and Urban Development, 645 F.2d 291, 294-95 (5th Cir. 1981).

V. Defendant's Counterclaim

Defendant filed a counterclaim seeking to have plaintiffs enjoined from violating the zoning and building ordinances. For the reasons set forth above, defendant is not entitled to judgment on this counterclaim, and it will be dismissed on the merits.

VI. Conclusion

For the reasons set forth above, plaintiffs are entitled to a declaratory judgment that defendant's enforcement of its zoning ordinance prohibiting more than eight unrelated handicapped persons from living in a single-family district as applied to Oxford House-C and Oxford House-W violates plaintiffs' rights under the Fair Housing Act, 42 U.S.C. งง 3601 et seq. and the Rehabilitation Act of 1973, 29 U.S.C. ง 794. Plaintiffs are also entitled to a permanent injunction enjoining the City from enforcing its zoning codes to prohibit OH-C and OH-W from operating with ten and twelve members respectively. Plaintiffs are not entitled to a broader injunction regarding all zoning or building codes. A separate judgment in accord with this opinion is entered this same date. Plaintiffs are directed to file any motion for attorneys' fees as directed by Local Rule 30.

JUDGMENT AND ORDER
In accordance with the Memorandum Opinion entered in this case and filed contemporaneously herewith, which is incorporated by reference herein,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiffs *1585 shall have judgment against defendant on plaintiff's first amended complaint and on defendant's counterclaim, and that defendant's counterclaim is dismissed on the merits.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant The City of St. Louis is PERMANENTLY ENJOINED from enforcing its zoning ordinance to prevent plaintiff Oxford House-C from operating with ten (10) unrelated handicapped residents at its current location or to prevent plaintiff Oxford House-W from operating with twelve (12) unrelated handicapped residents at its current location.
NOTES
[1] In large part, there was no dispute at trial as to the therapeutic benefit of the Oxford House program or the appropriate treatment modalities for drug and alcohol addiction.
[2] A significant amount of trial time was spent discussing the optimum or necessary number of members of any particular Oxford House. Plaintiffs' witnesses testified that the optimum number was somewhere between eight and fifteen. The state and federal law establish six as a minimum number. The defendant's current ordinance would allow a maximum of eight. The national average for all Oxford Houses is 9.7 members. Over 80% of the Oxford Houses nationwide and in Missouri have more than eight residents. This dispute is discussed in more detail at ง VI below.
[3] They are not so screened. Witnesses testified that this is because many, if not most, recovering addicts or alcoholics have criminal records resulting from their behavior while using alcohol and drugs. One witness testified that part of the rationale for the lack of criminal screening is the belief that those applicants who do not have criminal records simply never got caught, as most abusers had, at a minimum violated laws regarding drunken driving.
[4] OH-C is not located in a "conservation district", so no inspection for this purpose was required.
[5] The Franciscan Sisters were still the owners of record of OH-C because the term of the lease under the lease-purchase agreement with Karen Myers had not yet been completed.
[6] St. Louis has adopted the BOCA Existing Structures Code, Second Edition, as published by the Building Officials & Code Administrators, Inc., as its Existing Structures Code, which will be referred to here by the City's "ES" citations or as "BOCA."
[7] OH-C presented evidence, by way of expert testimony, that the ceiling height in this area could be modified to provide for a height of 6'9", which, in the opinion of plaintiff's expert, was ample ceiling height for a bedroom, although not in compliance with the BOCA code. OH-C actually applied for a building permit to make this change, which was denied.
[8] The alderman's confusion on this issue is not entirely surprising, given the evidence that none of the City housing inspectors or building or zoning officials who testified (and presumably none of the aldermen) have ever received any training regarding discrimination in housing practices.
[9] Although several of the current residents of each house could pay more, the evidence showed that for new residents even paying this amount is difficult. The $60 figure is a reasonable minimum that a person entering an Oxford House in St. Louis could be expected to pay, given the types of jobs typically available to addicts and alcoholics at the stage of recovery of a typical new Oxford House resident.
[10] The Court rejects the City's arguments that either house at issue here spent its money extravagantly or on unnecessary frills. The evidence showed that the houses spent their money on necessities and on the minimum amenities, such as telephone service and cable television, enjoyed by most working class or middle class families.
[11] To the extent that these conclusion of law, or the earlier findings of fact, may contain mixed findings of fact and conclusions of law, they are intended to comply with the requirements of Rule 52, Federal Rules of Civil Procedure.
[12] Plaintiff-Intervenor originally sought a slightly broader declaration and injunction, but subsequently joined in the First Amended Complaint at issue here, and therefore seeks the same relief sought by plaintiffs.
[13] The United States was also allowed to file an amicus brief in opposition to the defendant's argument regarding the applicability of the "maximum occupants" exemption in ง 3607.
[14] Although defendant has argued this is a reasonable restriction because of the very nature of a family, which defendant posits normally includes parents and children, the ordinance does not so define a family. A biological or adopted family of two married parents and eight children could live in the A district, but a family consisting of two married parents, three biological or adopted children, and five unadopted foster children could not.
[15] Plaintiffs presented evidence regarding the City's similar reaction to other proposed facilities for handicapped individuals and to one other Oxford House, but the undersigned finds that this evidence, although persuasive regarding the City's motivation in those instances, is too attenuated from the instant situation to significantly add to the proof of intentional discrimination in this instance. Thus, the decision rendered here is not based on any finding that City officials have been involved in a lengthy and complex conspiracy to prevent all handicapped persons from living in St. Louis. Rather, the decision rendered here is based on a finding that defendant's actions toward these plaintiffs was motivated by stereotypical and unfounded fears related to these plaintiffs' handicaps.
[16] Cleburne, of course, was decided prior to the 1988 amendments at issue here, and was an equal protection case, not a case brought under the Fair Housing Amendments Act. Although the Eighth Circuit did not discuss this distinction in Familystyle, it would seem that the 1988 amendments now require a court to use a higher degree of scrutiny in Fair Housing Amendment Act cases than that used in Cleburne. Familystyle's requirement that the ordinance be necessary to promote the government interest may well be a tacit reflection of this enhanced status and stricter scrutiny required by the 1988 amendments. Because the Court in Familystyle found that the state law at issue there did not have a disparate impact on the handicapped, but instead promoted the same goals as the FHAA, it did not actually need to go on to the second part of the analysis.
[17] Defendant's argument that it never enforced the ordinance against religious orders because no one ever complained supports the argument that defendant enforced the ordinance only against politically unpopular groups like the handicapped plaintiffs here.
[18] Defendant has argued that it had a "policy" of allowing up to eight unrelated handicapped individuals to live in a single-family district even under the three-person ordinance. This argument is not supported by the evidence; if, in fact, that was defendant's "policy" it surely would have communicated that policy to the representatives from the Missouri Department during one of their initial contacts which discussed Oxford Houses in general or OH-C in particular.
[19] As stated before, 80% of all Oxford Houses have more than eight residents.
[20] They would not be allowed even as a conditional use in the single-family neighborhoods at issue here, or even in the "B", two-family, or "C", multiple-family, districts, but instead would require a variance from the zoning code to operate in those districts. Both parties' expert witnesses testified that "use variances" such as this do not promote zoning policy, and that non-conforming "uses" should not be allowed.
[21] Plaintiffs' evidence meets their burden regardless of whether the so called "immediate effects" or "ultimate effects" standards are applied.
[22] Stated another way, there are other, less discriminatory ways to promote such a goal, such as spacing requirements of the type approved in Familystyle.
[23] In this regard the Court notes that the Western Division of the Missouri Court of Appeals has interpreted ง 89.020, subd. 2 as not applying to recovering drug addicts or alcoholics because they are not specifically named in the statute as "mentally or physically handicapped persons." See City of St. Joseph v. Preferred Family Healthcare, Inc., 859 S.W.2d 723 (Mo.Ct.App.1993). The same court also held that preventing group homes of more than five recovering drug abusers and alcoholics did not violate the Fair Housing Act. The undersigned disagrees with both conclusions reached by the Missouri Court of Appeals. This Court is not bound, of course, by the state court's determination of federal law, and the Missouri court's interpretation of the state statute has no effect on the outcome of this case, since the City here has not argued that ง 89.020, subd. 2 does not apply to recovering drug and alcohol abusers.
[24] Additionally, as both experts testified, under zoning theory (as opposed to practice) a "use variance" such as this should not normally be granted in light of the zoning code's legislative determination that group homes for more than eight are not even approved conditional uses in zones "A", "B", and "C".
[25] The language of the act was amended by Pub.L. 102-569, October 29, 1992, but those amendments have no effect on the substance of the claim presented here or the analysis of that claim.